HENRY S. MILTON, Respondent, v. MISSOURI DAIRY COMPANY and THE FRANKLIN ICE CREAM COMPANY, Appellants.

Kansas City Court of Appeals, April 5, 1915.

1. **FALSE IMPRISONMENT: Malicious Prosecution.** False imprisonment is a wrongful interference with one's personal liberty. In this case it was the arrest and detention of the plaintiff without a warrant furnishing legal authority therefor and this element differentiates the cause of action from that of malicious prosecution.

2. ————: **Evidence to Connect Defendants Therewith.** Where the president of one defendant corporation interested in protecting property claimed to have been stolen, requested a subordinate to have plaintiff arrested therefor, and thereafter that subordinate appears at the place where plaintiff is held with an automobile and a policeman, and plaintiff is thereupon taken to the police station without a warrant authorizing the arrest, this is sufficient to connect the said corporation with the wrong-

ful imprisonment. Direct evidence is not necesary to prove participation in the arrest. It may be inferred from circumstances.

3. ———: ———: ———. If plaintiff's reputation is offered on the theory that an injury thereto has been pleaded, the reputation proved must be a present reputation and not a reputation at some remote time in the past. While such former reputation may be shown if it is brought down to date of the imprisonment, yet when this is not done, it is error to prove such former reputation and then instruct the jury that they may allow for injury thereto.

4. ———: **Reputation of Plaintiff.** The general rule in civil cases is that evidence of plaintiff's reputation or character is not admissible unless it is put in issue by the pleadings. False imprisonment does not necessarily include injury to the character or reputation, and therefore the character of the plaintiff is said not to be directly in issue in such actions. By this it i. meant that if in a suit for false imprisonment only general damages are alleged and nothing is said about an injury to plaintiff's reputation, then plaintiff cannot offer evidence of his good reputation. But if such wrongful imprisonment has resulted in damage to his reputation and that is pleaded, then plaintiff has put it in issue. On the other hand, defendant may put it in issue by pleading, in mitigation of damages, that he acted in good faith in causing the arrest and by introducing evidence tending to cast suspicion on plaintiff.

5. ———: ———: **Time and Place of Reputation.** In order for good reputation to have any efficiency in rebutting defendants' claim of good faith it should be shown to exist at the place where defendant would be likely, or can be deemed, to have known of it. A reputation shown to have existed at some time three or four years previous and at a far distant community could not do this, unless it was brought home in some way to defendant.

Appeal from Jackson Circuit Court.—*Hon. Joseph A. Guthrie,* Judge.

REVERSED AND REMANDED.

*McCune, Harding, Brown & Murphy* and *R. B. Caldwell* for appellants.

*James M. Rader* and *E. A. Scholer* for respondent.

TRIMBLE, J.—This suit was on a petition in two counts, the first of which asked actual and punitive damages for false imprisonment, the second sought similar damages for malicious prosecution.

The suit grew out of the following facts: Plaintiff, Milton, and two others named Brown and Sebastian were employed at a barn maintained by defendant, the Missouri Dairy Company. At this barn the horses of both defendants were kept pursuant to an arrangement whereby the expense of feed for the horses was prorated between them in accordance with the number of horses maintained by each.

Some one reported to Chapman, the manager of the Dairy Company, that feed was being stolen from the barn and sold. It was the duty of Milton, Brown and Sebastian every morning to load the barn refuse and manure into a wagon, which Sebastian would then haul to the city dump. Having learned that feed was being taken from the barn by being concealed in the wagon under the manure, those in charge of the business began to observe things a little more closely. On the evening of June 26, 1912, Curnett, the foreman at the barn, noticed that the manure wagon, standing in an enclosed passageway south of and adjoining the barn, was covered with horse blankets. Upon investigating, he found five sacks of oats under them. He reported it to Howard the man in charge of the first floor of the barn. They say they examined the oats and found them to be of good quality. When they reported this to Chapman, he directed them to watch the oats and see what became of them. They remained at the barn that night. About seven o'clock the next morning, Brown got up into the wagon, tied the sacks which were open and put them under the seat in the front end of the wagon. Milton and Brown then pitched manure into the wagon while Sebastian was on the wagon loading it. When the wagon was loaded the sacks were completely covered by the manure.

When the wagon was loaded there is a dispute as to what took place. Brown says Milton told him to go along with Sebastian and help sell the oats. Milton says Brown asked him if he could go for an airing and that he, Milton, told him he could if his work was finished. Brown left the barn but not on the wagon. Before the wagon left, Sam Proudfoot, an employee of the Dairy Company, came and Sebastian asked him to get on and go with him. Proudfoot says that when he hesitated, Milton suggested that he go, and said "There is something doing. I have some oats there that we are going to sell." Proudfoot says he told Milton "You have a fat chance of getting out of here in the daytime," to which Milton replied, "Leave that to me, I have already got them," and that they had gotten oats before. Proudfoot says he didn't see any oats and did not think they had any. He got on the wagon with Sebastian, however, and went with him, Sebastian driving.

From the time Milton, Brown, and Sebastian began loading the wagon, Chapman, Curnett and Howard had been watching them, and when the wagon left, they secretly followed it. Instead of driving directly to the dump, Sebastian drove around a block or two until he was joined by Brown and then they went to the dump stopping on the way at a saloon. When the manure was unloaded at the dump the wagon was driven to the residence of a teamster by the name of Keller at Fourth and Gillis streets where they sold the oats, ten bushels, for four dollars, telling him that they were teamsters but had sold their horses and no longer had use for the feed. Keller examined the oats and found them of good quality. Keller had a five dollar bill but no change, and to make the change Proudfoot gave Keller a dollar and took the bill with the understanding that he would get the change and give Sebastian the four dollars on the way back.

At this moment the watchers appeared much to the surprise and consternation of the men, and Chapman seized the horses heads, as Sebastian was in the act of driving away, and demanded what they meant by selling his feed. He then ordered the men into the wagon and drove back to the barn. On reaching there, Chapman ordered them to come upstairs and as he passed Milton he told him to come up too. Milton asked "what's up." Chapman replied, "wait and see." Milton then followed them up. They all staid up there some time, but neither on the way from Keller's nor in the upstairs room did any of the men ask any explanation of why they were being kept there. Nor did plaintiff ask for any explanation on his part. After being in the upper room for some time, plaintiff went down to the basement to show some one, whom Chapman had directed to feed the horses, how the feeding should be done, and in a little while he was recalled to the room. There he found a policeman in waiting, and Milton and the two men, Brown and Sebastian, were pointed out to the officer and he took them in charge. Milton asked for no explanation of this treatment nor why he was arrested. The only request he made was to be allowed to change his clothes. He admits this, and the only reason he gives is that the Manager had told him to "wait and see" at the outset when he asked him "what's up." His request to change his clothes was refused and he was taken in an automobile by the officer along with the other men to the police station where they were searched, booked and locked up. Later in the day they were taken to the justice office where a warrant was issued. Afterward, plaintiff was tried on the charge of stealing the oats and acquitted.

Thereupon this suit was instituted. After a trial of the issues, the jury found a verdict for plaintiff on the first count for $1000 actual and one dollar punitive

damages, and found for defendants on the second count.

Plaintiff admits that he knew the sacks were in the wagon; that he helped sack the oats; but at the justice trial and the trial of this case he contended that the oats were spoiled oats and that Asbury a former foreman, who had left the barn about two weeks before they were sold, had authorized them to sell the oats for whatever they could get, and the claim of all three men was that they were merely obeying these orders. And yet no claim of this kind was made at the time of the arrest, nor, as stated, did he ask why he was being detained or arrested or offer any explanation to clear himself of any appearance of guilt. Milton admits that Sebastian gave him the four dollars obtained for the oats, but says it was given to him just before they started upstairs at the Dairy office to get the money due them for their wages after they had given bond, had been released and had gone to the barn and changed their clothes. When Chapman asked about the money for the oats, Milton gave it to him. Keller who bought the oats, and every man who examined them, swore they were good oats and not damp, rotten or sprouted as the men claimed they were. Proudfoot swore that he came to the barn shortly after Chapman reached there with the men from the place where the oats were sold, and that Milton said to him, "Well, Chapman got us." He also swore that at a meeting of the men a few days before the justice trial, Milton said it would be necessary for them to swear they had authority to sell the oats and wanted Proudfoot to testify to that effect which he declined to do. This testimony of Proudfoot's can have no force here since all of his testimony as well as many other suspicious and incriminating circumstances not mentioned herein are denied by Milton. But the facts which he does admit, the explanation he gives of their right to sell the oats, the failure to ask why he was

being arrested or imprisoned, his neglect to offer any explanation of the damaging appearances against him are all so inconsistent with the conduct of an innocent man that it is not easy to see how the jury in this case could return a verdict in his favor for substantial actual and nominal punitive damages. We have studied the record, however, and find that there is sufficient in the case to make it a question for the jury to say whether or not his explanation, tardy as it was, and his insistence that he was not stealing oats but was merely disposing of damaged oats in accordance with orders given him, are to be believed. The question of his guilt was a question of fact for the jury to determine. Although his explanation is unsatisfactory and his conduct, if innocent, almost inexplicable, yet, taking it all in all, the evidence is such that we cannot say, as matter of law, that he is not telling the truth.

It is urged that there is no evidence tending to connect the Ice Cream Company with the arrest. After a careful examination of the record we are unable to concur in this view. Under the arrangement between the two defendants, both were interested in the amount of feed used at the stable, and were therefore interested in stopping any stealing thereof. Jorgensen, an employee of the Ice Cream Company, but not of the Dairy Company, swore to the complaint which instituted the prosecution after the arrest had been made, and this affidavit placed the ownership of the oats in both companies. So that both defendants had a motive or reason for participating in the arrest. The president of the Ice Cream Company directed Jorgensen to have the men arrested. It is claimed now that the president merely communicated a request from the manager of the Dairy Company to Jorgensen to do that, but Jorgensen was not under the orders of the Dairy Company nor of any officer thereof. And there was evidence tending to show that the president of the Ice Cream Company himself directed Jorgensen to procure the

arrest, that is, as an order proceeding from him. Of course Jorgensen's act in swearing to the complaint alone and of itself could only connect the Ice Cream Company with the institution of the prosecution which has to do only with the second count. But the evidence shows that Jorgensen, after receiving directions from the president of the Ice Cream Company appeared at the barn at the same time as the policeman, and had an automobile there ready to take the arrested men to the station and in which they were taken, and all of this occurred before the warrant was issued. If the president of the Dairy Company directed the president of the Ice Cream Company to do anything it was to ''see to having a warrant got out'' while the latter's directions to Jorgensen were to have them arrested. Jorgensen was assistant manager of the Ice Cream Company and he seems to have obeyed orders and was present on the scene prepared to facilitate the taking of the men to the station and participated in the arrest. Direct evidence is not necessary to prove the Ice Cream Company's participation in the arrest. It may be inferred from circumstances. [Grimes v. Greenblatt, 47 Colo. 495.] There was substantial evidence tending to connect the Ice Cream Company with the arrest of plaintiff without a warrant furnishing legal authority therefor. This constitutes the cause of action charged in the first count and differentiates it from the cause of action charged in the second count. Consequently, there was sufficient evidence upon which to submit the first count to the jury as against the Ice Company.

Error is claimed because the court admitted evidence of the plaintiff's good reputation. The general rule is that in civil cases the character of plaintiff is not admissible. But where it is put in issue by the pleadings it is relevant. False imprisonment is a wrongful interference with one's personal liberty. It does not necessarily include injury to the character or

reputation. [Comer v. Knowles, 17 Kan. 436, l. c. 440; Cochran v. Toher, 14 Minn. 385; 12 Am. & Eng. Ency. of Law (2 Ed.), 729.] And it is said that the character of the plaintiff is not directly in issue in an action for false imprisonment as it is for malicious prosecution. [Geary v. Stevenson, 169 Mass. 23; 12 Am. & Eng. Ency. of Law (2d Ed.), 730.] By this we understand the authorities to mean that in a suit for false imprisonment which merely alleges damages generally as a result of the wrong and the plaintiff says nothing about any injury to his reputation, he cannot prove his good reputation as a part of his case. But if a wrongful imprisonment has resulted in injury and damage to his reputation and that fact is alleged in the petition and damages are asked for that injury, then it would seem that he could show such good reputation and the injury that it has sustained. In this way a *plaintiff* can bring his reputation in issue by the pleadings. On the other hand, if *defendant* pleads, in mitigation of damages, that he acted in good faith in causing the arrest, and adduces evidence to cast suspicion on plaintiff, then this brings plaintiff's character in issue and he may prove his good character to rebut the claim of good faith. [12 Am. & Eng. Ency. of Law (2 Ed.), 730; Am. Express Co. v. Patterson, 73 Ind. 430.] In the case at bar, plaintiff alleged in his petition an injury to his reputation and asked for damages on that account, and defendants pleaded in mitigation of damages that they acted in good faith under a belief that the plaintiff participated in stealing the oats and that they still believe he did so. This pleading was sufficient to make plaintiff's character an issue in the case and of itself would entitle plaintiff to show his good reputation in rebuttal of defendants' claim of having acted in good faith. But in order to have any force in this regard, it must be a reputation of which defendants would be likely to know else it would have no efficacy in disproving that they acted in

good faith.  Now the reputation which plaintiff proved
was not his reputation in Kansas City where defend-
ants would be held to know of it or at least likely to
know of it.  In fact, the evidence shows that they
were acquainted with him but a short time before the
alleged stealing of the oats took place.  No showing
whatever was made as to his reputation in Kansas City
nor what his reputation was at the time of the arrest.
The reputation he proved was the reputation he bore
in a community in Kansas a long distance from Kan-
sas City, and at a date some three or four years prior
to the time of his wrongful imprisonment.  How would
this have any tendency to show that defendants did not
act in good faith, or have probable cause to believe he
stole the oats?  It would have no such effect.  Only
such reputation as defendants knew or should have
known of, or could be held likely to have known of,
would operate to do this.  So far, therefore, as plain-
tiff's character was brought into the case by the nature
of defendants' answer, we say that the evidence of a
reputation plaintiff had in a distant community some
three or four years ago was not proper.  Of course,
the good reputation he had at that time and place
would not have been improper if he had also shown
what his reputation was at the time of the arrest and
in the community where the arrest occurred.

But if plaintiff is entitled to show his good reputa-
tion by reason of the fact that he has alleged an in-
jury thereto, then he must not only prove his reputa-
tion at the time of the arrest but also submit evidence
from which it can be inferred that his reputation at
that time suffered injury.  By his petition he has al-
leged that his reputation was injured by the arrest.
How can the jury determine that injury if there is no
evidence as to what that reputation was?  If the arrest
produced any injury to his reputation it was to his
reputation at the present time and not to a reputation
borne in former years.  Not only was no injury to his

reputation shown but the witness who testified to his former good reputation out in Kansas, swore that his reputation was as good after the arrest as it ever was before. And yet plaintiff obtained an instruction telling the jury to include injury to his reputation as a part of his damages. We do not mean to say that plaintiff must produce express, direct and positive evidence showing affirmatively that his reputation has suffered. That may be shown from facts from which it may be inferred. But unless there is some evidence to show what that reputation is at the time the alleged injury occurs we do not see how he can be awarded damages therefor.

Error is claimed on account of the refusal of the court to give defendants' instruction number 22 which in effect informed the jury that they were not concluded on the question of plaintiff's guilt of stealing the oats by the result of the case in the justice court, inasmuch as plaintiff's instruction number 5 was likely to make the jury think they were. It is not necessary to pass on this because, upon a new trial, the occasion for this instruction will not arise. The jury found for defendants on the malicious prosecution count and the new trial can only be had upon the other. Indeed, as both counts arose out of the same transaction, the finding in plaintiff's favor could result in a judgment upon only one of them. [Boeger v. Langenberg, 97 Mo. 390.]

The judgment is reversed and the cause remanded. All concur.